Mel DAHL, Plaintiff,

v.

**SECRETARY OF The UNITED STATES NAVY, et al., Defendants.**

**Civ. No. S–89–0351 MLS.**

United States District Court,
E.D. California.

Aug. 30, 1993.

---

Mel Dahl, in pro per.

Anthony J. Coppolino, U.S. Dept. of Justice, Civil Div., Washington, DC, for defendants.

## MEMORANDUM OF DECISION AND ORDER

MILTON L. SCHWARTZ, District Judge.

This case is before the court on plaintiff's and defendants' cross-motions for summary judgment on plaintiff's First and Fifth Amendment challenges to his discharge from the United States Navy.

### I. FACTUAL AND PROCEDURAL BACKGROUND.

The undisputed facts relevant to these summary judgment motions are as follows. Plaintiff enlisted in the Navy on October 14, 1980. During an official interview on March 10, 1981, plaintiff disclosed in response to questioning that he is a homosexual, but denied engaging in any homosexual conduct subsequent to enlisting in the Navy. Shortly thereafter, defendants advised plaintiff that he was being considered for discharge pursuant to Secretary of the Navy Instruction ("SECNAVINST") 1900.9D[1] and convened an administrative discharge board for that purpose. Despite extensive evidence of plaintiff's excellent service record and affidavits of support from plaintiff's shipmates and superiors, on December 16, 1981 the administrative board recommended that plaintiff be discharged, based on its finding that he "is a stated homosexual." Pfeiffer Decl., Ex. 8. Plaintiff was honorably discharged from the

Navy on January 13, 1982. Plaintiff then appealed to the Board for Correction of Naval Records, which upheld his discharge on March 19, 1986.

Plaintiff filed the instant action on March 13, 1989 challenging his discharge on grounds that it violated the First, Fourth, Fifth and Fourteenth Amendments and Title X of the United States Code. Among other things, plaintiff seeks reinstatement, an order prohibiting defendants from taking any further action against him pursuant to the homosexual exclusion policy, a declaration that the policy is unconstitutional, and costs of suit. On July 5, 1990, the court granted defendants' motion to dismiss the complaint in its entirety. Plaintiff appealed, and the Ninth Circuit reversed and remanded in light of *Pruitt v. Cheney*, 963 F.2d 1160 (9th Cir. 1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992). At a pretrial scheduling conference, plaintiff abandoned all but his Fifth Amendment equal protection claim[2] and First Amendment free speech claim. Plaintiff now moves for summary judgment on both of his claims and defendants move for summary judgment solely on plaintiff's equal protection claim.

### II. STANDARD OF REVIEW FOR SUMMARY JUDGMENT.

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate when the court is satisfied "that there

1. SECNAVINST 1900.9D provides in pertinent part:
   (b) A member [of the Navy] shall be separated under this instruction if, but only if, one or more of the following ... approved findings is made:
   (2) The member has stated that he or she is a homosexual or bisexual unless there is a further finding that the member is not homosexual or bisexual.
   Defs.' Ex. A to Ex. 1, SECNAVINST 1900.9D § 7(b)(2). This portion of SECNAVINST 1900.9D is referred to herein as the "homosexual exclusion policy."
   "Homosexual" is defined by SECNAVINST 1900.9D as "a person, regardless of sex, who engages in, desires to engage in, or intends to engage in homosexual acts." *Id.* § 5(a). "Bisexual" is defined as "a person who engages in, desires to engage in, or intends to engage in

homosexual and heterosexual acts." *Id.* § 5(b). Any reference in this opinion to homosexuals should be construed to refer to bisexuals as well.

2. The court notes that plaintiff's complaint alleges only that defendants violated his *Fourteenth* Amendment equal protection rights, although it is well-established that equal protection claims are applicable to the federal government only via the due process clause of the Fifth Amendment. *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954); *High Tech Gays v. Defense Indus. Security Clearance Office*, 895 F.2d 563, 570 (9th Cir.1990). However, the court does not view this as fatal error, since the complaint also alleges a violation of plaintiff's Fifth Amendment due process rights, an allegation which can be read to encompass a Fifth Amendment equal protection claim.

is no genuine issue as to any material fact[3] and that the moving party is entitled to judgment as a matter of law." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., Ltd.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), *quoting* Adv.Comm. Note on 1963 Amends. to Fed.R.Civ.P. 56(e).

In summary judgment practice, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), *quoting* Fed.R.Civ.P. 56(c). However, a summary judgment motion "may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file," without any affidavits, if the nonmoving party will bear the burden of proof at trial on a dispositive issue. *Id.* at 324, 106 S.Ct. at 2553.

If the moving party meets its initial responsibility, the burden shifts to the nonmoving party to establish the existence of a genuine issue of material fact. Fed.R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 585–86, 106 S.Ct. at 1355–56. The nonmoving party may not simply rely upon its pleading denials, but must tender evidence of specific facts in the form of affidavits or admissible discovery material, or both, in support of its contention that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. The nonmoving party's evidence must be believed and all reasonable inferences that can be drawn from that evidence must be drawn in favor of the nonmov-

ing party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," otherwise there is no genuine issue for trial. *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355.

On the other hand, the nonmoving party need not establish a material issue of fact *conclusively* in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). In other words, the nonmoving party's evidence is sufficient to withstand summary judgment if a reasonable trier of fact could return a verdict in favor of the nonmoving party based on that evidence. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir.1987). But if the nonmoving party fails to make a showing sufficient to establish an essential element of his case, and on which he will bear the burden of proof at trial, summary judgment may appropriately be granted. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2553.

## III. ANALYSIS.

### A. Equal Protection Claim.

▮ Both parties move for summary judgment on plaintiff's claim that the homosexual exclusion policy violates his Fifth Amendment right to equal protection because it is based on prejudice and bias against homosexuals. Fifth Amendment equal protection claims are treated the same as equal protection claims brought under the Fourteenth Amendment. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975). The threshold question in equal protection analy-

---

**3.** A fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct.

2505, 2510, 91 L.Ed.2d 202 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).

sis is whether the policy at issue is discriminatory. *See Watkins v. United States Army,* 847 F.2d 1329, 1336 (9th Cir.1988), *op'n vacated on other gds.,* 875 F.2d 699 (9th Cir. 1989). Defendants do not dispute that the homosexual exclusion policy discriminates against persons on the basis of their sexual orientation. *See id.* at 1337 (concluding that the Army's similar homosexual exclusion policy was discriminatory on its face).

### 1. Standard of review.

Given that defendants' policy is discriminatory, the court's next task is to ascertain what standard of equal protection review should apply. *See id.* at 1345.

### a. Applicability of strict scrutiny.

■ Plaintiff argues that the homosexual exclusion policy should be subject to strict scrutiny, while defendants contend that the policy is subject only to rational basis review. If strict scrutiny is applied, the policy will be struck down unless the classification drawn by the policy is "suitably tailored to serve a compelling [government] interest." *See City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). If, on the other hand, the rational basis standard is applied, the policy is presumed constitutional and will be upheld so long as the classification drawn is rationally related to a legitimate government interest. *See id.*

■ Strict scrutiny is applied when a legislative classification rests on an inherently suspect characteristic, such as race, religion or alienage, or "trammels fundamental personal rights." *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976). In *High Tech Gays v. Defense Indus. Security Clearance Office,* 895 F.2d 563 (9th Cir.1990), the Ninth Circuit squarely addressed the question whether laws and policies classifying individuals based on their sexual orientation are subject to strict scrutiny.

■ The *High Tech Gays* court first analyzed whether homosexuality is an inherently suspect characteristic (i.e. whether homosexuals are a "suspect class"). The court stated that to be considered a suspect class, "homosexuals must 1) have suffered a history of discrimination; 2) exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group; and 3) show that they are a minority or politically powerless." *Id.* at 573. Although the court agreed that homosexuals had suffered a history of discrimination, it did not agree that they satisfied the other two criteria. *Id.* Rather, it concluded that "[h]omosexuality is not an immutable characteristic; it is behavioral and hence is fundamentally different from traits such as race ... or alienage." *Id.* Moreover, the court said, "homosexuals are not without political power; they have the ability to and do 'attract the attention of lawmakers,' as evidenced by [several state statutes and local ordinances]."[4] *Id.* at 574, *quoting Cleburne,* 473 U.S. at 445, 105 S.Ct. at 3257.

Second, relying on *Bowers v. Hardwick,* 478 U.S. 186, 194–196, 106 S.Ct. 2841, 2846–47, 92 L.Ed.2d 140 (1986), the court rejected the argument that homosexual activity is a fundamental right. *High Tech Gays,* 895 F.2d at 571–74; *see also Watkins,* 847 F.2d at 1345. Accordingly, the court concluded that legislation or policies classifying individuals based on their sexual orientation are subject only to rational basis review. *High Tech Gays,* 895 F.2d at 574.

■ Plaintiff argues, however, that despite the holding in *High Tech Gays,* homosexuals nevertheless should be deemed a suspect class because "two important events have changed the landscape," rendering the holding in *High Tech Gays* suspect. Pl.'s Mem. in Supp. of Mot. for Summ.J. at 6:22–23. First, plaintiff asserts, "it has now been conclusively and authoritatively established that sexual orientation is biological, genetic and innate." *Id.* at 6:23–25. In support of this argument, plaintiff proffers a December 1988 study conducted by the Defense Personnel

---

**4.** For the same reasons, the court also held that homosexuals did not constitute a "quasi-suspect" class for purposes of the heightened, intermediate level of scrutiny currently applied to gender and illegitimacy classifications. *Id.* at 573. Plaintiff does not contend that homosexuals are a quasi-suspect class.

Security Research and Education Center, which concluded, *inter alia*, that "complex combinations of genetic, hormonal, neurological and environmental factors operating prior to birth largely determines what an individual's sexual orientation will be."[5] Pl.'s Ex. C at 4. Second, plaintiff asserts, because it is "clear that Congress has no intention of allowing the President to lift the ban [on homosexuals in the military] ... gays obviously do not have political clout with the relevant legislative body, and the Ninth Circuit's finding that gays do have such clout has now been shown to be incorrect."[6] Pl.'s Mem. in Supp. of Mot. for Summ.J. at 7:8–13.

■ Although plaintiff may have submitted sufficient evidence to create a triable issue of material fact as to whether homosexuality is an "immutable" characteristic, he has failed to submit any pertinent evidence tending to establish that homosexuals lack legislative power. Plaintiff's reference to Congress' recent refusal to allow homosexuals to serve openly in the military is irrelevant to the legal standard for determining whether a particular minority group lacks political power. The standard is not whether a certain group is "powerless to assert direct control over the legislature," for "if that were a criterion for higher level scrutiny by the courts, much economic and social legislation would now be suspect." *Cleburne*, 473 U.S. at 445, 105 S.Ct. at 3257. Rather, the test is whether the particular group at issue has "no ability to attract the attention of lawmakers." *Id.* The recent Congressional and executive dialogue concerning homosexuals' ability to serve in the military demonstrates that, despite their apparent inability to assert direct control over Congress, homosexuals have a significant ability to attract Congress' attention.[7] Accordingly, the court rejects plaintiff's argument that homosexuals constitute a suspect class for purposes of strict scrutiny analysis.

In the alternative, plaintiff contends that defendants' policy should be subject to strict scrutiny because it impinges on the "fundamental ... right to one's thoughts, feelings and emotions." Pl.'s Opp'n at 9:9–11. However, because plaintiff cites no authority for this argument, it must be rejected.[8] Plaintiff also urges the court to adopt the reasoning of the Colorado Supreme Court in *Evans v. Romer*, 854 P.2d 1270 (1993), in which the

---

5. Plaintiff also notes in his brief that a number of recent studies have concluded that sexual orientation is determined, at least partially, by biological and/or genetic factors. *See, e.g.,* Simon Le-Vay, "A Difference in Hypothalamic Structure Between Heterosexual and Homosexual Men," 253 Sci. 1034, 1035 (1991); and Michael Bailey and Richard C. Pillard, "A Genetic Study of Male Sexual Orientation," 40 Archives Gen. Psychiatry, 1089, 1092 (1991), cited in "Analyzing the Military's Justifications for Its Exclusionary Policy: Fifty Years Without a Rational Basis," 26 Loyola Law Rev. 151, 173 n. 192 (1992); *see also* "The Jurisprudence of Genetics," 45 Vand. Law Rev. 313 (1992).

6. As further support for this argument, plaintiff alleges that, since the ruling in *High Tech Gays*, legislation designed to foreclose homosexuals' participation in the democratic process has been or will be enacted in more than twenty states and "the incidence of violent crime directed at gay people has risen astronomically." Pl.'s Reply at 4:11–12. While this may be true, unlike the recent Congressional debate regarding the military's homosexual exclusion policy, the above occurrences have not been widely publicized enough for the court to take judicial notice that these events have in fact occurred. Therefore, the court does not consider the above allegations in its analysis.

7. Plaintiff also argues that because homosexuals have been subjected to a history of discriminatory treatment, they must also lack political power. However, this argument confuses the history of discrimination prong with the lack of political power prong of the suspect class test. It is undisputed that homosexuals have historically been discriminated against, but this does not necessarily mean that they therefore lack political power, as *High Tech Gays* made clear. *See* 895 F.2d at 573.

8. It is true that *Stanley v. Georgia,* 394 U.S. 557, 564–66, 89 S.Ct. 1243, 1247–49, 22 L.Ed.2d 542 (1969), *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 67, 93, 93 S.Ct. 2628, 2640, 2652, 37 L.Ed.2d 446 (1973) and *Jacobson v. United States,* — U.S. ——, 112 S.Ct. 1535, 1542, 118 L.Ed.2d 174 (1992), cited in connection with plaintiff's First Amendment argument, do contain language supporting the proposition that a person's thoughts, beliefs, and emotions are protected under the First Amendment. However, it would be a novel extension of this language to hold that homosexual thoughts, desires and emotions are fundamental rights for purposes of strict scrutiny analysis in the context of equal protection.

court held that an amendment to the Colorado Constitution that denied homosexuals any type of protected status was subject to strict scrutiny because it impinged on their fundamental right to engage in the political process. The court declines plaintiff's invitation. This case is distinguishable from *Evans* because the homosexual exclusion policy does not deny homosexuals their right to participate in the political process.[9]

In sum, absent sufficient, relevant evidence supporting the conclusion that homosexuals do not have political power or pertinent authority supporting the argument that defendants' policy trammels a fundamental right, this court is bound by Ninth Circuit law holding that the rational basis standard applies to equal protection challenges to legislation or policies classifying individuals based on their sexual orientation.

### b. Applicability of "active" rational basis review.

■ The above conclusion, however, does not end the court's analysis, for the parties disagree as to what type of rational basis review should be applied in this case. Plaintiff argues that, assuming strict scrutiny is inapplicable, then the court should apply the so-called "active" rational basis approach enunciated in *Pruitt,* 963 F.2d at 1165–1166. In *Pruitt,* the plaintiff challenged the Army's similar homosexual exclusion policy on equal protection and other grounds. The district court dismissed the plaintiff's claim, holding the Army's policy rational as a matter of law.

On appeal, the Army argued that the district court's decision should be affirmed because "its right to discharge homosexual servicepersons is so firmly supported in the law that any equal protection claim that Pruitt has asserted ... is legally insufficient on its face." *Id.* at 1164. The Ninth Circuit rejected this argument, holding that the Army's policy could not be held rational as a pure

matter of law. *Id.* at 1166. Rather, the court stated, a court must actively review the record *"to see whether the government [has] established on the record* a rational basis for the challenged discrimination." *Id.* at 1166 (emphasis in original). Relying on *Cleburne,* 473 U.S. at 450, 105 S.Ct. at 3259, and a preceding Supreme Court case, *Palmore v. Sidoti,* 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984), the court further stated that, even under rational basis review, a court may not simply accept the government's proffered justifications for its policy as presumptively valid, but must determine whether these justifications are motivated by constitutionally impermissible prejudice or bias against the class at issue. *Pruitt,* 963 F.2d at 1165–66. In light of these principles, the Ninth Circuit reversed and remanded the district court's judgment of dismissal as to the plaintiff's equal protection claim, requiring the Army to establish a factual record in support of its contention that its homosexual exclusion policy was rationally related to a permissible government purpose. *Id.* at 1166–67.

Defendants argue, however, that the active rational basis standard applied in *Pruitt* is either no longer good law or must be read consistently with subsequent United States Supreme Court and Ninth Circuit pronouncements regarding the permissible scope of rational basis review. Defendants cite *Heller v. Doe by Doe,* —— U.S. ——, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) and *United States v. Harding,* 971 F.2d 410 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1025, 122 L.Ed.2d 170 (1993), for the proposition that the government need not create an evidentiary record to show that a legislative or policy classification at issue is rationally related to a legitimate government interest.

*Heller* involved a class of mentally retarded individuals who challenged a statutory

---

**9.** Alternatively, plaintiff may have intended to offer *Evans* as support for his argument that homosexuals lack political power, since this case establishes that the State of Colorado enacted "anti-gay" legislation subsequent to the ruling in *High Tech Gays.* However, even assuming plaintiff did intend to use *Evans* in this fashion, evidence that one state has enacted legislation preventing homosexuals from participating in its political process is insufficient to support the conclusion that homosexuals generally lack political power as a class. *See Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512 (on a motion for summary judgment, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff").

distinction between the mentally retarded and the mentally ill for purposes of involuntary commitment proceedings. The statute provided that the burden of proof for involuntary commitment of the mentally retarded was "clear and convincing evidence," while the burden of proof for the mentally ill was "beyond a reasonable doubt." —— U.S. at ——, 113 S.Ct. at 2641. The *Heller* plaintiffs argued that these distinctions were irrational and violated the equal protection clause of the Fourteenth Amendment. The district court granted summary judgment for the plaintiffs, and the Sixth Circuit affirmed.

In reversing the lower courts and rejecting the plaintiffs' argument, the Supreme Court stated that a challenged classification:

> "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification" [citations omitted]. A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data" [citations omitted]. A statute is presumed constitutional ... and "[t]he burden is on the one attacking the legislative arrangement to negative [sic] every conceivable basis which might support it," [citation omitted] whether or not the basis has a foundation in the record.

*Id.* at ——, 113 S.Ct. at 2642–43 (emphasis added); *accord, Harding,* 971 F.2d at 413–14 (holding that a legislative distinction between "crack" and powder cocaine was rational and stating that " '[t]hose challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker' [citation omitted]").

Defendants argue that, in light of *Heller* and *Harding,* the active rational basis standard, to the extent it purports to require

defendants to provide more than a "presentation of the basis of the policy on the record," is no longer valid law. Defs.' Mem. in Supp. of Mot. for. Summ.J. at 11:14–15. What defendants seem to say is that, as long as they present *any* justification at all for their policy, the court may not question this justification but rather must deem it rational as matter of law.

Defendants read too much into *Heller* and *Harding.* They are correct that these cases appear to have overruled *Pruitt* inasmuch as *Pruitt* implied that the burden was on the policymaker to persuade the court that the policy at issue possesses a rational basis. After *Heller* and *Harding,* there can be no question that the burden is on the person challenging the policy to negate every conceivable rational basis for the legislative justification.[10] *See Heller,* —— U.S. at ——, 113 S.Ct. at 2643; *Harding,* 971 F.2d at 413. In addition, *Heller* and *Harding* are also inconsistent with *Pruitt* to the extent that *Pruitt* may have *required* the government policymaker to submit evidence in support of its policy on remand. *See Heller,* —— U.S. at ——, 113 S.Ct. at 2643 ("a State ... has no obligation to produce evidence to sustain the rationality of a statutory classification"); *Harding,* 971 F.2d at 412 ("[i]n establishing a statutory classification, one need not ... supply empirical evidence to support a rational relationship").

However, defendants incorrectly conclude that the question whether a challenged policy is rationally related to a legitimate governmental interest is therefore always a question of law. Although both the *Heller* and *Harding* courts did state that evidence need not *necessarily* be proffered in support of the rationality of a given policy, this proposition cannot reasonably be construed to mean that, once evidence is proffered, the court has no responsibility under Rule 56 to analyze whether there is a triable issue of material fact as to the policy's rationality. *Compare High Tech Gays,* 895 F.2d at 574–578 (analyzing evidence offered regarding the ration-

---

**10.** In fact, contrary to the Ninth Circuit's conclusion in *Pruitt,* this has always been true of the rational basis standard. *See, e.g., Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979); *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973).

ality of the Army's homosexual security clearance policy in light of the parties' respective burdens under Rule 56) and *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 876–884, 105 S.Ct. 1676, 1680–85, 84 L.Ed.2d 751 (1985) (holding a domestic tax preference statute irrational as a matter of law after the parties had explicitly waived their right to an evidentiary hearing in the state trial *and* appellate courts).

Indeed, the *Heller* Court itself closely examined the record to determine whether the defendants' justifications for the legislation at issue in that case were in fact rationally based. The Court stated that "even the standard of rationality as we so often have defined it must find some footing in the realities of the subject addressed by the legislation." —— U.S. at ——, 113 S.Ct. at 2643. "That requirement is satisfied here," the Court said, because "Kentucky has proffered more than adequate justifications for the differences in treatment between the mentally retarded and the mentally ill." *Id.* Those justifications were supported by evidence that: (1) mental retardation is easier to diagnose than mental illness; (2) it is easier to determine whether the mentally retarded pose a physical threat to themselves or others than to determine whether the mentally ill pose the same threat; and (3) the prevailing methods of treatment for the mentally retarded are much less invasive than those for the mentally ill. *Id.* at ——, 113 S.Ct. at 2643–46 (citing numerous scientific treatises and studies).

In addition, for two reasons, *Heller* and *Harding* do not disturb *Pruitt's* holding that a court must examine the record to determine whether the policymaker's proffered justifications for its policy are based on impermissible prejudice. First, the Court in *Heller* made clear that the rational basis standard enunciated in that case was the same standard used in *Cleburne* (the primary case relied upon by the Ninth Circuit in *Pruitt* as support for the active rational basis standard). *Heller*, —— U.S. at ——, 113 S.Ct. at 2643. In applying this *traditional* rational basis standard, the *Cleburne* Court explicitly rejected the defendant's proffered justifications for a local ordinance requiring

group homes for the mentally retarded to obtain special use permits, on the ground that the justifications, which were unsupported by any evidence in the record, were based on "an irrational prejudice against the mentally retarded." 473 U.S. at 450, 105 S.Ct. at 3259.

Second, unlike the instant case, neither *Heller* nor *Harding* involved allegations that the discriminatory laws at issue were irrational because they were based upon prejudice or bias against a particular class of individuals. Rather, the plaintiffs in those cases merely alleged that the legislative classifications (between the mentally ill and the mentally retarded in *Heller* and between crack and powder cocaine in *Harding*) were irrational *in and of themselves.*

In sum, there is no support for defendants' argument that the court must accept without question defendants' proffered bases for the homosexual exclusion policy without analyzing the relevant evidence and determining whether the policy is motivated by prejudice against homosexuals. Because the parties are cross-moving for summary judgment and both have offered evidence in support of their respective motions, the court must analyze whether each party has met its respective burdens of production under Rule 56 as to the policy's rationality or irrationality under the *Heller/Harding* standard. If the evidence, construed in the light most favorable to defendants, shows that there is *no* reasonably conceivable rational basis for the homosexual exclusion policy, and the court cannot conceive of a rational basis (i.e. because it is based solely on illegitimate prejudice), then plaintiff is entitled to summary judgment. Alternatively, if the evidence, construed in the light most favorable to plaintiff, shows that there is *any* reasonably conceivable rational basis for the policy, then defendants are entitled to summary judgment. Finally, if the evidence creates a disputed issue of material fact as to the policy's rationality, then neither party is entitled to summary judgment.

**c. The role of the principle of "military deference" in rational basis analysis.**

■ Before the court turns to the rational basis analysis described above, it must

address defendants' remaining argument regarding the permissible scope of rational basis review of laws and policies involving the military. Defendants contend that, in analyzing the rationality of the homosexual exclusion policy, the court should accord significant if not complete deference to the " 'considered professional judgment' of 'appropriate military officials' regarding the proper composition of the Armed Forces." Defs.' Mem. in Supp. of Mot. for Summ.J. at 5:14-16, *quoting Goldman v. Weinberger,* 475 U.S. 503, 509, 106 S.Ct. 1310, 1314, 89 L.Ed.2d 478 (1986). Defendants note that deference to the military's judgment is particularly important in this case because the homosexual exclusion policy "is based upon a series of carefully considered, professional [m]ilitary judgments and almost 50 years of experience by a succession of civilian and [m]ilitary leaders." Defs.' Ex. 2 at 56, letter to Ass't Comptroller Gen'l from Ass't Sect'y of Defense re Dep't of Defense ("DOD") response to Gen'l Acct'g Ofc.Rept. on DOD's homosexual exclusion policy.

■ The court agrees that judicial review of military regulations "is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Goldman,* 475 U.S. at 507, 106 S.Ct. at 1313. However, as plaintiff points out, although individual autonomy is not as great within the military community as it is within the larger civilian community, the essence of individual constitutional rights nevertheless remain intact. *See id.* (the "aspects of military life do not, of course, render entirely nugatory in the military context the guarantees of the First Amendment"); *see also Rostker v. Goldberg,* 453 U.S. 57, 70, 101 S.Ct. 2646, 2654, 69 L.Ed.2d 478 (1981) ("when [Congress'] decision [to register only males for potential conscription] is challenged on equal protection grounds, the question a court must decide is not which alternative it would have chosen, had it been the primary decisionmaker, but whether that chosen by Congress denies equal protection of the laws"). Thus, "[s]imply labeling the legislative decision 'military' ... does not automatically guide a court to the correct constitutional result." *Id.* at 70, 101 S.Ct. at 2654. In other words, the concept of deference to the military does not relieve the court of its obligation to examine the underlying bases for defendants' policy to determine whether they indeed withstand rational basis scrutiny. *See, e.g., Dubbs v. Central Intell. Agency,* 769 F.Supp. 1113, 1116 n. 3 (N.D.Cal.1990) ("deference to Executive Branch decisions does not require the judiciary to abdicate *its* authority under Article III to decide whether or not an individual's right to equal protection under the Federal Constitution has been violated") (emphasis in original); *Meinhold v. U.S. Department of Defense,* 808 F.Supp. 1455, 1457 (C.D.Cal.1993), *on appeal* ("the [c]ourt cannot merely defer to the 'military judgment' as the rationale for the policy—the [c]ourt must consider the factual basis underlying the 'military judgment' "). With these general principles in mind, the court now turns to the question whether defendants' policy possesses a rational basis.

## 2. The existence of a rational basis.

■ "Application of the rational basis standard requires a two-step analysis." *Jackson Water Works v. Public Util. Comm'n,* 793 F.2d 1090, 1094 (9th Cir.1986), *cert. denied,* 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 184 (1987). The court's first task is to determine whether the policy in question serves a legitimate governmental interest. *Id.* If this question is answered in the affirmative, the court must then proceed to determine whether the discriminatory policy is rationally related to the achievement of that legitimate interest. *Id.*

In support of their summary judgment motion and in opposition to plaintiff's motion, defendants argue that their reasons for discharging declared homosexuals from Navy service, as enunciated in SECNAVINST 1900.9D, are legitimate as a matter of law. SECNAVINST 1900.9D states as follows:

4. **Policy.** Homosexuality is incompatible with military service. The presence in the military environment of persons who engage in homosexual conduct or who, by their statements, demonstrate a propensity to engage in homosexual conduct, seriously impairs the accomplishment of the military mission by adversely affecting the ability

of the Navy and the Marine Corps to maintain discipline, good order and morale, to foster mutual trust and confidence among servicemembers, to insure the integrity of the system of rank and command, to facilitate assignment and worldwide deployment of servicemembers who frequently must live and work under close conditions affording minimal privacy, to recruit and maintain members of the naval service, to maintain the public acceptability of service in the Navy and Marine Corps and to prevent breaches of security.

Defs.' Ex. A to Ex. 1, SECNAVINST 1900.9D, § 4. Defendants argue that the legitimacy of their interest is apparent from the face of this policy and that no further judicial inquiry is required to determine rationality.

Nevertheless, as additional support for the legitimacy of their governmental interest, defendants also offer the declaration of Vice Admiral Ronald Joseph Zlatoper, Chief of Naval Personnel and Deputy Chief of Naval Operations,[11] who states that the Navy's considerations of maintaining discipline, good order and morale and fostering mutual trust and confidence among servicemembers "all pertain to a critical factor in military effectiveness: unit cohesion." Defs.' Ex. 1, Zlatoper Decl. at ¶ 5. According to Zlatoper, the presence of homosexuals in the Navy has:

a direct[,] adverse impact on the ability of military leaders to sustain [interpersonal] relationships, instill camaraderie, and maintain the cohesion necessary for a unit to remain a highly effective fighting force. The presence in units of individuals who engage in, desire to engage in, or intend to engage in homosexual acts, polarizes units and undermines the ability of a commanding officer to foster good morale and maintain an effective chain of command.

*Id.* He also states that homosexuals are "unable to maintain the necessary respect and trust of subordinates and peers, thereby degrading the individual's ability to perform supervisory duties successfully" and jeopardizing the military's system of rank and command. *Id.* at ¶ 6.

Zlatoper further declares that allowing homosexuals in the military threatens the privacy rights of other servicemembers because:

military personnel of the same sex are forced to share confined sleeping and dressing areas and shower and toilet facilities on board ships and submarines and in barracks under circumstances allowing minimal privacy. As with society in general, servicemembers would regard such exposure to members who might be sexually attracted to them to be an infringement on the privacy rights of the majority of our personnel. The effect of this on morale and unit cohesion would be negative.

*Id.* at ¶ 7; *see also* Defs.' Ex. 12, National Defense Authorization Act for Fiscal Year 1994, Senate Committee on Armed Services Report [To Accompany S. 1298] at 278–84. Finally, Zlatoper claims that "if the military does not maintain professional standards of discipline which preclude homosexual conduct, young men and women will be more reluctant to consider service in the military.... If the public views the military as tolerating homosexual conduct in the ranks, they may hesitate to recommend or approve military service by those who look to them for guidance." Defs.' Ex. 1, Zlatoper Decl. at ¶ 8.

Defendants argue that this evidence, particularly when considered in light of the principle of judicial deference to "professional military judgments," establishes that defendants' purposes are legitimate as a matter of law. Defs.' Mem. in Supp. of Mot. for Summ.J. at 12:12.

Plaintiff, on the other hand, argues in support of his summary judgment motion and in opposition to defendants' motion that defendants' interests must be deemed illegitimate as a matter of law because each of the proffered reasons for the policy are based on prejudice and bias against homosexuals.

In support of this argument, plaintiff offers, *inter alia*, the following evidence:

11. Defendants also offer, *inter alia*, a number of studies conducted by various entities and the transcripts of testimony before the Senate Committee on Armed Services on March 31, 1993 and May 11, 1993. However, much if not all of this evidence is more harmful to defendants than it is helpful to them, as discussed below.

1. Selected portions of the "Report of the Board Appointed to Prepare and Submit Recommendations to the Secretary of the Navy for the Revision of Policies, Procedures and Directives Dealing With Homosexuals, 21 December, 1956—15 March, 1957" [the Crittenden report];

2. Selected portions of a report prepared by the Defense Personnel Security Research and Education Center ("PERSEREC") entitled "Nonconforming Sexual Orientations and Military Suitability," December 1988 [1988 PERSEREC report]; and

3. Selected portions of a report prepared by PERSEREC entitled "Preservice Adjustment of Homosexual and Heterosexual Military Accessions: Implications for Security Clearance Suitability," January 1989 [1989 PERSEREC report].

The Crittenden report, a study commissioned by DOD itself, states in pertinent part as follows:

> [o]ne concept which persists without visible supporting data, but which cannot be disproved at this time because of the absence of data, is the idea that homosexual individuals and those who have indulged in homosexual behavior cannot acceptably serve in the military. As has been mentioned above, there have been many known instances of individuals who have served honorably and well, despite being exclusively homosexual....

> [Another] concept which persists without sound basis in fact is the idea that homosexuals necessarily pose a security risk. It is difficult to determine just how this idea developed, but it seems that it first appeared in ... the report of the Hoey Committee. This Committee, however, based its recommendation on "the *opinions* of those best qualified to know, namely, the intelligence agencies of the Government." However, no intelligence agency, as far as can be learned, adduced any factual data before that Committee with which to support these opinions.... Some intelligence officers consider a senior officer having illicit heterosexual relations with the wife of a junior officer or enlisted man much more of a security risk than the ordinary homosexual.

Pl.'s Ex. B (emphasis in original).

The 1988 PERSEREC report, another study commissioned by DOD, indicates that "the available data all point to the conclusion that preservice background characterization and subsequent job performance of homosexuals in the military is satisfactory." Pl.'s Ex. C at 8. The report goes on to state that:

> [i]t has commonly been assumed that *the existence of a deep-seated prejudice against homosexuals as a class* would be a barrier to the creation and development of attitudes that would foster effective cohesive relations....

> The intensity of prejudice against homosexuals may be of the same order as the prejudice against blacks in 1948, when the military was ordered to integrate.

> The order to integrate was first met with stout resistance by traditionalists in the military establishment. Dire consequences were predicted for maintaining discipline, building group morale, and achieving military organizational goals. None of these predictions of doom has come true. Social science specialists helped develop programs for combating racial discrimination, so that now the military services are leaders in providing equal opportunity for black men and women. It would be wise to consider applying the experience of the past 40 years to the integration of homosexuals....

> Most of the issues raised [regarding the effect that admitting declared homosexuals would have on unit cohesion] reflect traditional anti-homosexual arguments, [and] are reminiscent of the issues raised when black athletes ... were first allowed to participate in professional baseball. [These] concerns are also reminiscent of the arguments advanced against the 1948 order to desegregate military establishments, and the later arguments that sought to minimize the role of women in the Armed Forces....

> Those who resist changing the traditional policies support their position with state-

ments of the negative effects on discipline, morale, and other abstract values of military life. Buried deep in the supporting conceptual structure is the fearful imagery of homosexuals polluting the social environment with unrestrained and wanton expressions of deviant sexuality. It is as if persons with nonconforming sexual orientations were always indiscriminately and aggressively seeking sexual outlets. All the studies conducted on the psychological adjustment of homosexuals that we have seen lead to contrary inferences.

*Id.* at 8–10 (emphasis added).

Finally, the 1989 PERSEREC report, also commissioned by DOD, states that: (1) in general, homosexuals show "better levels of preservice adjustment than heterosexuals in areas relating to school behavior"; (2) homosexuals display "greater [levels of] cognitive ability than heterosexuals"; and (3) "with the exception of drug and alcohol use, homosexuals resemble those who successfully adjust to military life more so than those who are discharged for unsuitability." Pl.'s Ex. D at 2.

As the above discussion indicates, both parties have met their initial burdens under Rule 56 of coming forward with some evidence in support of their respective motions.[12] Therefore, the only remaining question is whether, construing each party's evidence in the light most favorable to it, either party has demonstrated that there is a disputed issue of material fact sufficient to withstand summary judgment in the opposing party's favor.

■ At the outset, the court notes that, under the Supreme Court's decisions in *Palmore*, 466 U.S. 429, 104 S.Ct. 1879, and *Cleburne*, 473 U.S. 432, 105 S.Ct. 3249, followed by the Ninth Circuit in *Pruitt*, 963 F.2d 1160, policies based on or motivated by the prejudice of one group towards another do not further any conceivable legitimate government interest and must be deemed irrational as a matter of law. In *Palmore*, the Court addressed the question whether a state court's order divesting a mother of the custo-

dy of her infant, based on social disapproval of her marriage to a person of another race, violated equal protection. In striking down the order, the Court stated: "[t]he Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." 466 U.S. at 433, 104 S.Ct. at 1882.

One year later, in *Cleburne*, the Court struck down as violative of equal protection a local zoning ordinance requiring special use permits for group homes for the mentally retarded. The Court rejected each of the defendant's asserted purposes for the ordinance, including an alleged concern with the negative attitudes of neighboring property owners, as based on mere "irrational prejudice against the mentally retarded." 473 U.S. at 450, 105 S.Ct. at 3259. Relying on *Palmore*, the Court stated that "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwellings and the like." *Id.* at 448, 105 S.Ct. at 3258. The Court also rejected the defendant's argument that the ordinance was designed to protect the mentally retarded from junior high school students across the street who might harass them. The Court stated that "denying a permit based on such vague, undifferentiated fears is again permitting some portion of the community to validate what would otherwise be an equal protection violation." *Id.* at 449, 105 S.Ct. at 3259.

Defendants argue, however, that unlike defendants in *Palmore* and *Cleburne*, they "do not rely on prejudice or bias as a basis for the policy"; rather, defendants say, the record "sets forth several bases for the military's policy, including the promotion of such goals as cohesion within military units and the protection of the privacy interests of service-members." Defs.' Opp'n at 6:6–10. Defendants further contend that "plaintiff's motion sets forth little more than conclusory criticisms of the policy and fails to demon-

---

12. Although both parties offer evidence that postdates plaintiff's discharge, the evidence proffered concerns the same or nearly the same homosexu-

al exclusion policy at issue in this case. In addition, neither party has filed formal objections to the opposing party's evidence.

strate that [there is] no rational basis for the policy." *Id.* at 5:21–6:1.

The court is not persuaded by defendants' argument. Plaintiff's evidence at the very least raises an inference that the homosexual exclusion policy is based solely on prejudice and bias against homosexuals. Defendants' evidence fails to controvert the inferences of prejudice and bias that must be drawn from plaintiff's evidence. To the contrary, for the reasons explained in detail below, defendants' evidence *supports* if not confirms the conclusion that the policy both effectuates and is solely motivated by prejudice against homosexuals. Moreover, for reasons also explained below, the court cannot conceive of any legitimate basis for the policy.

First, with the possible exception of the security risk rationale (*see infra*), all of the reasons asserted by defendants as the bases for their policy are prejudicial on their face. Even assuming that homosexuals threaten "unit cohesion," the integrity of the system of rank and command, recruiting of Navy servicemembers, protection of heterosexual servicemembers' privacy rights and "public acceptability" of Navy service, such threats can only conceivably arise from: (1) heterosexual dislike of homosexuals for moral or other reasons; (2) heterosexuals' apparent fear that they will be victimized, threatened or harassed by homosexuals; and/or (3) the notion that homosexuals are uniquely incapable of controlling their sexual desires. These rationales are directly analogous to the state court's concern with social disapproval of interracial marriages in *Palmore* and the city's concern with the "negative attitudes" of property owners towards the mentally retarded in *Cleburne*, both of which were invalidated as based on illegitimate prejudice.

Furthermore, even assuming the rationales are not based on patently prejudicial notions regarding homosexuals as a class, the fact that the notions are unsupported by defendants' own evidence mandates an inference that they have no legitimate basis in fact and are therefore based on prejudice. *See Cleburne,* 473 U.S. at 449–50, 105 S.Ct. at 3259–60 (rejecting the city's proffered bases for its ordinance as prejudicial after concluding that they had no legitimate factual basis). For example, the 1988 PERSEREC report (Defs.' Ex. 8 at 31) states that "[i]t is as if persons with nonconforming sexual orientations were always indiscriminately and aggressively seeking sexual outlets. All the studies conducted ... lead to contrary inferences.... In one carefully conducted study, homosexuals actually demonstrated a lower level of sexual interest than heterosexuals.... In fact, the manifold criteria that govern sexual interest are identical for homosexuals and heterosexuals, save for only one criterion: the gender of the sexual partner".[13]

Defendants' proffered bases for the homosexual exclusion policy are undermined in other respects by SECNAVINST 1900.9D itself. For example, defendants concede that, under this instruction, homosexuals may serve in the Navy provided that they do not reveal their sexual orientation to others. Apparently, as long as heterosexual servicemembers or recruits know only that some servicemembers might be homosexual, but do not know exactly who is homosexual, they do not object to working, showering and living with homosexuals. However, once heterosexual servicemembers or recruits learn that a particular member is homosexual (or that homosexuals are generally permitted to serve openly in the Navy), unit cohesion, recruiting, and privacy are suddenly threatened. The only inference to be drawn from the instruction's failure to reach undeclared homosexuals is that the threats to military

---

13. Not only does defendants' evidence fail to support the underlying reasons why homosexuals allegedly pose a threat to military effectiveness, but it also does not support the existence of the threat itself. For example, section 10 of SECNAVINST 1900.9D provides that "nothing in this instruction precludes retention of a member ... for a limited period of time in the interests of national security when authorized by the Secretary of the Navy." Defs.' Ex. A to Ex. 1, SECNA-VINST 1900.9D at § 10. The provision supports only one inference: that the threats homosexuals pose to unit cohesion, recruiting, privacy, etc. are hypothetical, for if such threats actually existed, defendants would not seek to retain homosexuals "in the interests of national security" (for example, in time of war) when unit cohesion and other similar concerns would presumably be most critical, but rather would more actively seek to discharge them.

effectiveness posed by homosexuals, assuming such threats actually exist, arise solely from heterosexuals' adverse reactions to the presence of known homosexuals in the Navy, and not from the behavior of homosexuals themselves. Given this, the court cannot conceive how the policy *cannot* be motivated by prejudice.

Defendants' security risk rationale likewise cannot stand, for two reasons. First, defendants fail to offer any evidence contradicting plaintiff's evidence that homosexuals do not present a security risk to the Navy.[14] Second, the rationale cannot conceivably be legitimate, because the only possible threat homosexuals could pose to military security (i.e. that undeclared homosexuals might be "discovered" and blackmailed) could be obviated by repealing the very policy that the threat allegedly justifies (i.e. by allowing homosexuals to serve openly in the military). In the absence of any conceivable legitimate basis for the security risk rationale, the court can only infer that this, too, is based on prejudice.

In fact, portions of defendants' evidence can only be construed as providing direct support for the conclusion that the policy is based on prejudice. In particular, in his testimony before the Senate Armed Services Committee during a hearing held May 11, 1993 to discuss whether to amend the military's homosexual exclusion policy, retired General Norman Schwartzkopf nearly admitted that the basis for the policy is prejudice against homosexuals. He stated:

> [w]hether we like it or not, in my years of military service, I have experienced the fact that introduction of an open homosexual into a small unit immediately polarizes that unit and destroys the very bonding that is so important for the unit's survival in time of war. For whatever reason, the

organization is divided into a majority who oppose, a small minority who approve, and other groups who either do not care or just wish the problem would go away, and I do not find this surprising, given the divisiveness that I have encountered in our Nation in the past year. The attitudes of our servicemen and women simply reflect, in my opinion, the attitudes that I have encountered in the American people.

Defs.' Ex. 3 at 13:16–14:3. General Schwartzkopf further testified that:

> many who advocate lifting the ban on homosexuals in the military blithely say we can overcome all of the problems ... by ordering ... military leaders at all levels to "institute training for all personnel on the acceptance of homosexuals ...," even when a large number of the leaders and troops have clearly stated that "they oppose allowing homosexuals in the military" and "believe gays serving openly in the military would be very disruptive to discipline."
>
> The military establishment is not fragile, but in my mind such actions would be seriously overloading their plate. They will faithfully try [to] execute the orders of their civilian leaders, but their hearts simply will not be in it. To me, they will be just like many of the Iraqi troops who sat in the deserts of Kuwait forced to execute orders they did not believe in.
>
> What about our troops' rights? Are we really ready to do this to the men and women of our armed forces and to risk a possible decrease in our Nation's ability to defend itself simply to *force our servicemen and women to accept a lifestyle of a very well-organized, well-financed, and very vocal, but what turns out to be a very small minority of our society?* I personally sincerely hope not.

---

**14.** As previously indicated, it is true that under *Heller* a policymaker need not offer evidence that its policy is rational. Nevertheless, a policymaker's failure to offer evidence is relevant to the court's analysis, for if: (1) the opposing party produces evidence tending to establish that the policy is irrational; (2) the policymaker offers no evidence tending to negate the opposing party's claim; and (3) the court cannot conceive of any set of facts which would support a finding that the policy is rational, then summary judgment must be granted in the opposing party's favor. *See Celotex*, 477 U.S. at 323–24, 106 S.Ct. at

*Id.* at 16:21–17:18 (emphasis added).[15]

Under the Supreme Court's rulings in *Palmore* and *Cleburne,* the court may not, consistent with the Constitution's guarantee of equal protection of the laws to all citizens, give effect to such illegitimate fears and biases reflected in government policy, whether military or civilian. *Palmore,* 466 U.S. at 433, 104 S.Ct. at 1882; *Cleburne,* 473 U.S. at 450, 105 S.Ct. at 3259; U.S. Const. amends. V, XIV.

Taking a slightly different tack, however, defendants also argue that their policy is not based on unconstitutional prejudice because it is *exclusively* designed to further the Navy's interest in preventing homosexual conduct, which plaintiff concedes is a legitimate government interest under current decisional law. " 'In determining the composition of the Armed Forces,' " say defendants, the Navy " 'does not have to take the risk that an admitted homosexual will not commit homosexual acts which may be detrimental to its assigned mission.' " Defs.' Mem. in Supp. of Mot. for Summ.J. at 14:16–19, *quoting Ben–Shalom v. Marsh,* 881 F.2d 454, 460–61 (7th Cir.1989), *cert. denied,* 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990). By equating persons who have declared that they are homosexual with persons who have a "propensity" to engage in prohibited homosexual conduct, *see* Defs.' Ex. A to Ex. 1, SECNAVINST 1900.9D, §§ 4 and 5(a), defendants contend, they are simply acting to prevent the risk that such conduct will occur.

Again, defendants' own evidence does not support their argument. For example, during a March 31, 1993 hearing before the Senate Armed Services Committee on whether Congress should alter the military's homosexual exclusion policy, the following exchange occurred between Senator Levin and Dr. David H. Marlowe, Chief of the Department of Military Psychiatry:

> Senator Levin: ... do you believe a large amount of antipathy among the troops against homosexuals serving is based on rational grounds of the likelihood of homosexual behavior or is based on prejudice?

> Dr. Marlowe: I believe a significant part of it is based on prejudice.

Defs.' Ex. 6, Senate Committee on Armed Services, "Hearing to Receive Testimony on the Military Policy Concerning the Service of Gay Men and Lesbians in the Armed Forces: the Role of Unit Cohesion in Developing Combat Effectiveness," March 31, 1993, at 184:3–8.

Defendants' argument that their policy is designed to prevent impermissible homosexual conduct is also undermined by the failure of SECNAVINST 1900.9D to reach undeclared homosexuals. This failure leaves defendants in the untenable position of asserting that an undetected homosexual has no propensity to engage in homosexual acts and presents no risk of undermining the military mission by engaging in prohibited homosexual conduct, while a declared homosexual does have such a propensity and does present such a risk. The distinction is not only facially illogical, but also unsupported by any evidence.[16]

---

2552–53; *Heller,* —— U.S. at ——, 113 S.Ct. at 2642–43.

**15.** Although defendants' evidence doubtless speaks for itself, the court also takes judicial notice of the fact of President Clinton's July 19, 1993 speech made in support of the recently revised homosexual exclusion policy. President Clinton stated:

> [c]learly the American people are deeply divided on this issue, with most military people opposed to lifting the ban because of the feared impact on unit cohesion, *rooted in disapproval of homosexual lifestyles,* and a fear of invasion of privacy of heterosexual soldiers....
> [T]hose who oppose lifting the ban are clearly focused not on the conduct of individual gay service members but on *how non-gay service*

members *feel about gays in general* and, in particular, those in military service.
"Clinton: Policy on Miliary 'Sensible Balance'," The Washington Post, July 20, 1993 (emphasis added).

**16.** Indeed, as previously indicated, defendants' evidence shows that homosexuals, whether declared or undeclared, do not present an unusual risk of engaging in prohibited conduct. *See, e.g.,* Defs.' Ex. 8, 1988 PERSEREC report at 31; *see also* "Clinton: Policy on Gays in Military 'Sensible Balance,' " Washington Post, July 20, 1993, *quoting* President Clinton's July 19, 1993 speech on homosexuals in the military (" 'there is no study showing [homosexuals] to be less capable or more prone to misconduct than heterosexual soldiers. Indeed, all the information we have indicates that they are not less capable or more prone to misbehavior' ").

SECNAVINST 1900.9D makes other patently illogical distinctions that weaken defendants' position. For example, section 7(b)(1) provides that a servicemember will not be discharged even if he or she has engaged in prohibited homosexual conduct, if a finding is made, among others, that such conduct "is a departure from the member's usual and customary behavior" and "is unlikely to recur." Defs.' Ex. A to Ex. 1, SECNAVINST 1900.-9D, § 7(b)(1). This tends to show that the homosexual exclusion policy is not aimed solely at preventing prohibited conduct, for if homosexual conduct were as significant a concern as defendants contend, they certainly would not take the risk that someone who has proven his or her inability to comply with the Navy's code of conduct would not do so again. Section 7(b)(1) of the instruction also illustrates that a declared homosexual who has not engaged in any prohibited conduct is deemed to present an intolerable risk of disruption, but someone who has violated the code of conduct, yet insists he or she is not homosexual, is deemed not to present such a risk.

Even under the rational basis standard, the court cannot give effect to such illogical and factually unsupported distinctions made by legislative classifications. *See Cleburne,* 473 U.S. at 449–50, 105 S.Ct. at 3259–60. In *Cleburne,* the city attempted to justify its ordinance requiring a special use permit for a group home for the mentally retarded by arguing that: (1) the home would be located on a flood plain and would present a fire hazard; (2) the mentally retarded might take actions for which the city would have legal responsibility; (3) the mentally retarded would be unable to live in crowded conditions; and (4) the home would lead to overcrowding in the area. The Court rejected all of these proffered rationales for the ordinance on grounds that they made invidious and illogical distinctions which were unsupported by any evidence in the record between group homes for the mentally retarded and other similar high density land uses allowed without permit, such as fraternity, sorority, apartment and boarding houses, dormitories, nursing homes, and hospitals. *Id.* Because of these anomalies and inconsistencies, the Court concluded that "requiring a permit in this case appears to us to rest on an irrational prejudice against the mentally retarded." *Id.* at 450, 105 S.Ct. at 3260. Likewise, here, the unsupported distinction between declared and undeclared homosexuals leads to the inescapable inference that the homosexual exclusion policy rests solely on prejudice against homosexuals.

Moreover, even assuming that defendants' policy is logically designed to prevent prohibited conduct, it still draws an impermissible classification, for it singles out homosexuals for discharge absent any evidence of prohibited conduct, while heterosexuals are not discharged until prohibited conduct has occurred and been proven. This, too, is compelling evidence that defendants' policy is motivated by prejudice.[17] *Cf. Robinson v. California,* 370 U.S. 660, 665–66, 82 S.Ct. 1417, 1419–20, 8 L.Ed.2d 758 (1962) (holding that a California statute that made the status of narcotic addiction a criminal offense, even absent proof of actual use, possession, purchase or sale of narcotics, violated the Eighth Amendment).

In sum, defendants' rationales for the homosexual exclusion policy and the evidence offered in support of those rationales supports, rather than undermines, plaintiff's argument and evidence that the policy is not based on any legitimate government interest.

In addition, the record does not establish, and the court cannot conceive of, any other legitimate basis for the policy. Both plaintiff's and defendants' evidence shows that the policy is *not* based on a perception that ho-

---

17. In fact, the homosexual exclusion policy is indistinguishable from a patently unconstitutional hypothetical policy providing that ethnic minorities must be excluded from military service because they have a "propensity" to engage in theft, although non-minority service members are not excluded unless and until they engage in theft. Surely defendants would not attempt to defend the constitutionality of such a policy; likewise, they cannot defend the policy at issue in this case. *Cf. United States v. Brignoni–Ponce,* 422 U.S. 873, 883, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975) (holding that the Fourth Amendment prohibits immigration officials from stopping a vehicle near the Mexican border to question its occupants about their immigration status when the only ground for suspicion is their apparent Hispanic ancestry).

mosexuals are incapable of performing adequately in the military. Indeed, defendants' evidence tends to show that homosexuals are more than capable of acceptable military performance. For example, a June 1992 General Accounting Office report entitled "Defense Force Management: DOD's Policy on Homosexuality" ("the GAO report") declares that "DOD officials do not contend that homosexuals cannot or do not perform as well on the job as heterosexuals; in fact, in some cases commanders have noted that homosexuals are extremely good performers." [18] Defs.' Ex. 2 at 27. In addition, a July 1990 memorandum issued by the Navy to all commanders, commanding officers, and officers in charge stated that: "[e]xperience has ... shown that the stereotypical homosexual female in the Navy is hardworking, career-oriented, willing to put in long hours on the job and among the command's top professionals." Defs.' Ex. 10 at 3. Defendants point out that this statement was made in an attempt to explain why female homosexuals are not as easily detected as male homosexuals. Nevertheless, the statement also serves as an admission that homosexuals may serve ably in the military, which further undermines defendants' position that the policy is not based, in whole or in part, on prejudice against homosexuals.

Defendants' lengthy attempt to demonstrate the unreliability of plaintiff's evidence also fails to provide any support for the policy. For example, defendants note that passages in the Crittenden report quoted by plaintiff are taken out of context and that the report's basic objective was to "rid the Navy of habitual homosexuals" and to "provide a deterrent to homosexual activity." Defs.' Opp'n at 9:1–2. However, the fact that the report's overall purpose was to examine how homosexuals should be discharged from the Navy (not whether they should be discharged) does not render the statements made in the report any less probative.

Defendants make similar comments with regard to plaintiff's use of the 1988 PERSEREC report. For instance, defendants say that plaintiff fails to quote a passage from the report stating that job performance of homosexuals may not be as important to military organization as " 'the effects of homosexuals ... on that important but ephemeral quality: group cohesion' " and that future studies would have to be conducted on the latter subject. Defs.' Opp'n at 10:8–10, *quoting* Defs.' Ex. 8 at 33. But the fact that the study concluded that homosexuals *may* have an adverse impact on group cohesion is inconsequential: even if it were proven that the presence of homosexuals adversely affects military life or performance, that fact would not obviate the central constitutional problem that the cause of the adverse impact is prejudice against homosexuals.

Defendants also note that the 1988 PERSEREC report was rejected by DOD because its authors exceeded the scope of their assigned study (i.e. "the nexus, if any, between homosexuality and security clearances for DOD *civilian* employees and government contractors"). Defs.' Opp'n at 10 n. 9 (emphasis in original). This argument is also unpersuasive: the fact that the report's authors exceeded their mission does not undermine their conclusions. A similar analysis defeats defendants' remaining objections to the other evidence in the record.

Finally, none of the authorities cited by defendants enable the court to uphold the policy, for none involve the same legal issues and factual circumstances present here. *Beller v. Middendorf*, 632 F.2d 788 (9th Cir. 1980), cited repeatedly by defendants, is distinguishable from this case on several grounds. First, *Beller* involved a substantive due process challenge to the Navy's homosexual exclusion policy, and therefore "did not deal with discrimination as such, or with the requisite level of justification for discrimination." *Pruitt*, 963 F.2d at 1165. Second, unlike the instant case, the servicepersons in *Beller* were discharged for having engaged in homosexual *conduct*, not simply for having declared their status as homosexuals. Finally, "[t]o the degree that *Beller* ... rested on prejudice of others against homosexuals

---

18. Although this report is no doubt offered to establish on the record DOD's comments on those aspects of the report with which it did not agree (*see* Defs.' Ex. 2, GAO report at 56–77), DOD did not object to that portion of the report discussed herein.

themselves,[19] rather than on disapproval of specific acts of criminal conduct, its reasoning is undercut by the Supreme Court's decision[s] in *Palmore* [and] *Cleburne*."[20] *Pruitt,* 963 F.2d at 1165.

*Schowengerdt v. United States,* 944 F.2d 483 (9th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1514, 117 L.Ed.2d 650 (1992), the only other Ninth Circuit case relied on by defendants, is also distinguishable. In that case, the plaintiff was discharged from the Navy Reserve after an office search revealed evidence indicating that he was bisexual. The plaintiff then challenged the Navy's discharge policy on Fifth Amendment due process and other grounds. The district court granted summary judgment in favor of defendants on all of plaintiff's claims, and the Ninth Circuit affirmed. However, in so doing, the Ninth Circuit explicitly stated that it was not addressing the question whether the Navy's policy violated equal protection, noting that "an equal protection objection to the Navy's discharge policy is not the same as a substantive due process objection."[21] *Id.* at 490 n. 8.

Nor does the principle of deference to the military require a finding that defendants' policy is constitutional. Defendants' "considered professional judgment," no matter how important, cannot outweigh the Fifth Amendment's guarantee of equal protection of the laws to all citizens. *See Goldman,* 475 U.S. at 507, 106 S.Ct. at 1313 (the "aspects of military life do not render entirely nugatory in the military context" the guarantees of the Constitution). No governmental entity, even the military, can enact and enforce prejudicial policies without doing violence to this guarantee. As the court in *Palmore* stated, the "Constitution cannot control ... prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." 466 U.S. at 433, 104 S.Ct. at 1882. To defer to the military in this case would be to unconstitutionally give effect to the "private biases," prejudices and fears of those who support the homosexual exclusion policy. *See id.; Cleburne,* 473 U.S. at 450, 105 S.Ct. at 3259.

For the foregoing reasons, the court concludes that, even drawing all reasonable inferences from the evidence in defendants' favor, plaintiff has met his burden of demonstrating that the homosexual exclusion policy cannot conceivably be based on any government interest other than illegitimate prejudice and that it is therefore irrational as a matter of law. Accordingly, defendants' summary judgment motion must be denied and plaintiff's motion must be granted as to the equal protection claim.

19. *See Beller,* 632 F.2d at 811–812 ("the Navy could conclude that a substantial number of naval personnel have feelings regarding homosexuality, based upon moral precepts recognized by many in our society as legitimate, which would create tensions and hostilities, and that these feelings might undermine the ability of a homosexual to command the respect necessary to perform supervisory duties").

20. "Similar weaknesses inhere in *Hatheway v. Sect'y of the Army,* 641 F.2d 1376 (9th Cir. 1981)," *cert. denied,* 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981), another case involving homosexual conduct. *Pruitt,* 963 F.2d 1165 n. 4. Plaintiff in *Hatheway* challenged his court martial conviction for sodomy under Article 125 of the Uniform Code of Military Justice on several constitutional grounds, including Fifth Amendment equal protection. As the Ninth Circuit in *Pruitt* observed:

[i]n rejecting the equal protection argument, [the] *Hatheway* [court] relied on the same justifications accepted in *Beller,* including those

arising from prejudice of other servicemembers or potential recruits against homosexuals.... Much of the same can be said of the other cases ... that rely on *Beller* to support the rationality of blanket discrimination by the armed forces against homosexuals. *See Dronenburg v. Zech,* 741 F.2d 1388 (D.C. [Cir.] 1984); *Rich v. Secretary of the Army,* 735 F.2d 1220 (10th Cir.1984). These cases involved homosexual conduct, and essentially adopted *Beller* in finding the discrimination justified. *Pruitt,* 963 F.2d at 1165 n. 4.

21. The court is also not persuaded by the reasoning of the Seventh Circuit in *Ben–Shalom,* 881 F.2d 454 and the Federal Circuit in *Woodward v. United States,* 871 F.2d 1068 (Fed.Cir.1989), *cert. denied,* 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990), both of which upheld the military's homosexual exclusion policy against an equal protection challenge even absent any prohibited homosexual conduct. Both courts indiscriminately equated homosexual status with conduct and neither court considered the prejudice argument raised by plaintiff herein.

## B. First Amendment Claim.

■ Plaintiff also moves for summary judgment on his one remaining claim, which rests on the free speech clause of the First Amendment.[22] Although plaintiff acknowledges that under *Pruitt* a servicemember's admission that he or she is homosexual is simply "evidence of status" and does not constitute protected speech, he argues that "status qua status" is protected by the First Amendment's free speech clause. Pl.'s Mem. in Supp. of Mot. for Summ. J. at 13:3–4. Plaintiff contends that defendants' policy punishes homosexuals for their status by punishing them for their homosexual thoughts, feelings, emotions and desires.

Although plaintiff cites five cases for the proposition that status is protected by the First Amendment, none provide adequate support for plaintiff's position. Three of the cases concern freedom of religion rather than of speech. See *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1978); *Torcaso v. Watkins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); *McDaniel v. Paty*, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978). The other three cases, *Stanley v. Georgia*, 394 U.S. 557, 565–66, 89 S.Ct. 1243, 1248–49, 22 L.Ed.2d 542 (1969), *Paris Adult Theatre I*, 413 U.S. 49, 67, 93, 93 S.Ct. 2628, 2640, 2652, 37 L.Ed.2d 446 (1973) and *Jacobson v. U.S.*, — U.S. —, —, 112 S.Ct. 1535, 1542, 118 L.Ed.2d 174 (1992), although providing authority for the general proposition that a person's thoughts, feelings and desires are protected under the First Amendment, do not support the specific proposition that homosexual status is protected by the free speech clause of the First Amendment. While plaintiff's argument is intriguing, without further direction from the higher courts, this court is unwilling to expand the reach of First Amendment jurisprudence so far. Accordingly, plaintiff's summary judgment motion must be denied as to the First Amendment claim.

## IV. CONCLUSION.

For the foregoing reasons, IT IS ORDERED:

1. That defendants' motion for summary judgment is DENIED;

2. That plaintiff's motion for summary judgment is GRANTED as to plaintiff's seventh claim for relief (equal protection) and is in all other respects DENIED;

3. That plaintiff is entitled to judgment against defendants, as follows:

a. For an order requiring defendants to reinstate him into the United States Navy and to restore to him all rights, honors and privileges of that status;

b. For an order requiring defendants to strike, delete, remove and expunge all record of plaintiff's sexual orientation and his statements regarding same from any and all of plaintiff's records in defendants' possession;

c. For an order enjoining defendants from taking any adverse action against plaintiff by reason of his homosexual status or on account of statements of his homosexual orientation;

d. For an order enjoining defendants from taking any action against plaintiff based on the purported authority of directives or regulations mandating separation from Navy service by reason of homosexual status or on account of statements of homosexual orientation;

e. For a declaration that defendants' action in separating plaintiff from Navy service based solely on his declaration of homosexual orientation is unconstitutional;

f. For a declaration that SECNAVINST 1900.9D or any other directive or regulation mandating separation from service by reason of homosexual status or on

---

**22.** Defendants did not move for summary judgment on plaintiff's First Amendment claim because they concluded that this claim was no longer viable in light of the Ninth Circuit's remand order in this case. That order provides in pertinent part: "[t]he order dismissing Dahl's complaint is reversed and remanded. *Pruitt v. Cheney*, No. 87–5914 [963 F.2d 1160, —] slip op. at 11295 (9th Cir. Aug. 19, 1991)." While the court is also doubtful that plaintiff's First Amendment claim remains viable given the Ninth Circuit's citation to *Pruitt*, which rejected a similar free speech claim, it nevertheless reaches the merits of plaintiff's claim in an exercise of caution.

account of statements of homosexual orientation is unconstitutional; and

g.  For costs of suit;

4.  That the final pretrial conference and trial dates currently set in this case are VACATED.

IT IS SO ORDERED.